UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                                                                    Docket No. 12-cr-10264-RGS

DANNY VELOZ

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
POST-TRIAL MOTION (ECF NO. 1027)**

Defendant Danny Veloz hereby supplements his Motion to Set Aside Verdict and for New Trial Pursuant to Fed. R. Crim. P. 33 and for Judgment Notwithstanding the Verdict Pursuant to Fed. R. Crim. P. 29 (ECF No. 1027). The motion raised four issues: (1) a new trial should be granted due to evidence that was tampered with and disingenuous testimony of Government witnesses; (2) judgment of acquittal should be granted due to a fatal variance; (3) the motions to suppress evidence should be re-opened and granted due to evidence adduced at trial; and (4) the motions to dismiss should be re-opened and granted based on evidence adduced at trial. Defendant's previously filed motions and memoranda are incorporated herein. This memorandum supplements the argument regarding defendant's Rule 33 motion for new trial and request that the suppression motions be re-opened.[1]

---

[1] Defendant requested additional time in which to file a supplemental memorandum of law so that he could obtain and review trial transcripts. Due to inadvertence, counsel was late in requesting transcripts, and because the trial of *United States v. Chin*, 14-cr-10363-RGS occurred during much of the intervening time period, the court reporter was unable to complete the transcripts prior to the filing date of this memorandum.

1

### I. The Defendant Is Entitled to a New Trial Based on the Government's Persistent *Napue* Violations

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The key to the Government's case against Danny Veloz was developed through the testimony of cooperating witnesses who were allegedly co-conspirators of Veloz. As such, the credibility of these witnesses was of paramount importance to the viability of the Government's case. Importantly, the three witnesses, Maldonado, Wallace and Guzman, all conceded on cross-examination that they had lied before the grand jury. While the Government had the cooperators correct some of their perjury in pretrial disclosures to the defense, there remained perjured testimony that went uncorrected until cross-examination at trial. Some of the most obvious discrepancies in the cooperators' stories remained unaddressed and ignored by the Government. For instance, each cooperator testified that no one ever asked him about the middle seat taken out of the van used in the Amparo kidnapping. When questioned by defense counsel at trial each told a different self-serving story. The Government asked no follow-up questions and rather

2

than search for the truth, given the obvious leverage the right to pull a cooperation agreement bestows upon them, they let conflicting stories lay unaddressed. It is axiomatic that a conviction cannot be allowed to stand where the Government stands idly by and allows a cooperating witness to testify falsely.

The United States Supreme Court set the standard for dealing with issues of this nature in *Napue v. Illinois*, 360 U.S. 264 (1959). In *Napue*, the witness, in response to a question posed to him by the government, denied that he had been promised any consideration for his cooperation. In reversing the defendant's conviction, the Court was clear that a prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," and that the principle applies equally when the Government, "although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. The use of false testimony by the Government violates a defendant's constitutional right to due process of law. As such, a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

In the case at bar, this is even more so because in significant instances the false statements made by the witnesses were directly in opposition to *Brady* disclosures made by the Government. The *Brady* obligation, which requires the Government to disclose exculpatory evidence in its possession to

a defendant,[2] was extended in *United States v. Agurs*, 427 U.S. 97 (1976), to require the Government to provide impeachment information of which it is aware to the defendant. Here, Veloz specifically requested impeachment evidence, yet, when the witnesses testified in a materially false way, the Government chose to let the falsehoods stand.

The legal standard in this Circuit is well-settled. "[A] prosecutor 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction' regardless of whether the prosecutor 'solicit[s] false evidence' or, as here, 'allows [false evidence] to go uncorrected when it appears.' The use of such false testimony violates the defendant's constitutional right to due process." *United States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) (quoting *Napue*, 360 U.S. at 269).

In the case at bar, the Government not only allowed the witnesses' false statements to go uncorrected, it aggressively took steps to obfuscate the lies. For example, with Wallace, after he testified on cross-examination that it "was possible" that he was the fifth kidnapper that witnesses had seen in Lynn in July 2012, the Government sought on re-direct to lead him into stating that he wanted to do the Lynn kidnapping but could not. Furthermore, the Government went on to ignore the fact that the other two cooperators left Wallace out of the Lynn kidnapping entirely – Maldonado under direct examination testified that he did not remember Tommy being

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

4

involved. Instead Maldonado, Guzman and the Government stuck to the story that there were four people, and that one of them was an unknown Puerto Rican mechanic who picked up the ransom but never met Veloz. The testimony on cross was that the Government never asked for any description of the individual involved in the kidnapping – not his height or weight or location or contact information. The Government assiduously avoided poking at a clear lie.

Likewise, the tainted evidence, such as cell phones and computers that contained unexplained data that was present on the devices and which was dated after the devices had been seized by agents, went either ignored by the Government, or they attempted to explain it away. For example, regarding the Guzman cell phone, which contained a call to the phone number associated with the purchase of a GPS device, the Government argued that it could have been inadvertently made when conducting an extraction report. However, the call was made several hours before the extraction report was conducted. The evidence showed that the extraction report on was conducted on September 19, 2012, from 17:50:59 to 17:51:18. The phone call was made on September 19, 2012 at 6:43:59 UTC, which is four or five hours earlier than the extraction report was run, depending on the time of year.

Another example of tainted evidence is the Reynoso laptop computer. The agent, John Orlando, had sole possession of Reynoso's computer during the time an unexplained download was made. SA Orlando acknowledged

that he kept the device for 18 months, from October 10, 2012 to April 7, 2014, and that the device was in his sole possession on the date in question. The evidence showed that a USB device was connected to Reynoso's laptop on October 11, 2012. Defendant made clear that if a search was made for either the date, October 11, 2012, or alternatively record 61110 of the extraction report on Reynoso's computer, it would appear that a USB device was attached, and the data was downloaded and changed.[3] It remains unexplained how such a large group of files came to be associated with that date, when it was in the custody of SA Orlando, and there was no extraction report for that date. The Government merely argued that the defense had missed its opportunity and had sought to bring this information out through an unqualified witness. Evidence that the same case agent, who was one of two agents who had possession of the Guzman phone from which a call was made while it was in federal custody, had apparently tampered with another piece of critical evidence that was in Government custody, played out as a tactical error on the part of the defense rather than a concern for the trustworthiness of the evidence and the integrity of the Court system.

Similarly, the Government used apparently altered GPS evidence, which was downloaded by agents rather than acquired from U.S. Fleet Tracking. Agents served an administrative subpoena on US Fleet Tracking on November 8, 2012, and agents downloaded the information shortly

---

[3] A USB flash drive containing a copy of the extraction report data is being hand-filed with the clerk's office.

thereafter.  Defendant's trial exhibit number nine is a photo provided in discovery that shows a geofence with a phone number to which alerts were to be sent when a vehicle enters the area.[4]  This area can be seen being entered by cars with GPS monitors on them in evidence provided by the Government, yet there were no text alerts and the geofence is missing.  The data downloaded by the federal officer charged with safeguarding the material does not include any geofence.  The inescapable conclusion is that the evidence that was on the US Fleet website on November 5, 2012, was no longer on the website when the download took place days later, and that the data was altered.

As to the unexplained Manchester Union Leader photograph that somehow ended up on Veloz's computer, with a time and date stamp prior to the photo being taken,[5] the Government simply ignored this inconvenient impossibility.

> The ultimate mission of the system upon which we rely to protect the liberty of the accused as well as the welfare of society is to ascertain the factual truth, and to do so in a manner that comports with due process of law as defined by our Constitution. This important mission is utterly derailed by unchecked lying witnesses, and by any law enforcement officer or prosecutor who finds it tactically advantageous to turn a blind eye to the manifest potential for malevolent disinformation. *See United States v. Wallach*, 935 F.2d 445 (2nd Cir. 1991) ("Indeed, if it is established that the government knowingly permitted the

---

[4] The representative of US Fleet testified that if there were text alerts, U.S Fleet would or should have those records.
[5] See Defendant's Tr. Ex. No. 27 (photograph subpoenaed from the Manchester Union Leader).  See also excerpt from N. Clemente extraction report, included on USB flash drive filed by hand with the clerk's office.

introduction of false testimony 'reversal is virtually automatic.'")
(citations omitted).

*N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2000).

When one examines the full record of this case, including the witnesses' initial statements to the police, one finds many inconsistencies on the part of the Government's cooperating witnesses, who were the keys to it case, and which the Government chose to ignore.

## II. The Defendant Is Entitled to a New Trial Based on the Court's Admission into Evidence of the Fruits of the Search of 443-447 Andover Street

Veloz moved pretrial for the suppression of the fruits of a search of 443-447 Andover Street Apartment # 9, and the evidence seized from the apartment including, *inter alia*, two laptop computers, one tablet computer, two thumb drives, seven cell phones, and documents. Moreover, Veloz requested but was denied, an evidentiary hearing on a *Franks* motion in regard to that search warrant. These motions and memoranda in support are incorporated by reference herein. The trial testimony of SA Orlando and Henry Maldonado make clear that a hearing on the *Franks* motion should have been granted, and the motion to suppress should have been allowed. Defendant requests that their trial testimony be incorporated into the request for reconsideration of the *Franks* and suppression motions.

As to the uncorrected falsehood in the search warrant affidavit regarding the alleged identification of Veloz by Maldonado at his initial interview, SA Orlando testified that he did not tell the prosecutors that

8

Henry Maldonado made an identification of Veloz at the Manchester Police Department. It remains unclear where this statement, which made its way into the Government's opposition to the defendant's *Franks* motion and was subsequently adopted by this Court in its findings, came from. *Franks v. Delaware*, 438 U.S. 154 (1978) ("It would be an unthinkable imposition upon [the authority of a magistrate judge] if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.").

Other apparent falsehoods have had the same unfortunate path, where they were offered by SA Orlando, adopted and used by the Government (e.g., ECF No. 234 at 11), and then cited by this Court in the memorandum of decision (ECF No. 396 at 5). For instance, SA Orlando claimed that Maldonado's van and Veloz' car were parked in front of Veloz residence when agents took Maldonado past the residence on the morning of July 25, 2012. At trial the defense introduced photos encompassing the entire front of the Veloz residence taken on July 25, 2012 at the time of the execution of the search warrant.[6] Admittedly, this is hours later in the day, but neither vehicle is in front of the Veloz residence. One could argue that perhaps someone used the Veloz vehicle during the course of the day, but no evidence to that effect was sought or proffered. However, in the case of the Maldonado van, which was known to have been taken at some later date from a different

---

[6] See Defendant's Tr. Ex. Nos. 32-34.

9

spot on the same street by Maldonado's wife, and sold on a date unknown to law enforcement, there is no explanation for its movement. In fact, it could not have been moved: the owner was in federal custody and the keys were either in his possession or at his house. At trial, Maldonado, in his first day of testimony, did not testify to his van being driven to or being present at the Veloz residence. After an overnight break, during which Maldonado met with the prosecutor, he testified that Tommy Wallace had driven the van to Veloz' house. Of course, Wallace was also in federal custody on July 25, 2012, so he would have been unable to move the van. Notably, Wallace did not testify to driving Maldonado's van to Veloz residence.

As was its custom in this trial, the Government, who had relied in sworn documents on these claims, left this apparent critical and glaring untruth unexplained and unaddressed. The Court, which has both adopted the claims and denied the *Franks* and suppression motions, must set aside the verdicts and reopen the suppression issues so that the Government and its agents can explain how these critical inaccuracies found their way into the filings of the prosecutors and the ruling of the Court.

Respectfully submitted,
DANNY VELOZ                                                    Dated: October 30, 2017
By his attorney,

/s/ Mark W. Shea
Mark W. Shea
929 Massachusetts Avenue
Suite 200
Cambridge MA  02139-3134
617.577.8722

10

**Certificate of Service**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 30, 2017.

/s/ Mark W. Shea
MARK W. SHEA